IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TRACY JOHNSON,                          )        CASE NO. 1:20CV1089
                                        )
              Plaintiff,                )
                                        )        JUDGE JOHN R. ADAMS
        v.                              )
                                        )        MAGISTRATE JUDGE
                                        )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                  )
SECURITY ADMINISTRATION,                )
                                        )        **REPORT AND RECOMMENDATION**
              Defendant.                )

Plaintiff Tracy Johnson ("Johnson") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

supplemental security income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g) and 42 U.S.C. 1383 (c).  This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

 For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

Johnson filed an application for SSI on June 22, 2015.  Tr. 328.  She alleged disability

based on the following: brain aneurism, fibromyalgia, arthritis, bronchitis, back pain, liver mass,

and inflamed colon.  Tr. 328-329.  After denials by the state agency initially and on

reconsideration, Johnson requested an administrative hearing.  Tr. 402.  A hearing was held

before an Administrative Law Judge ("ALJ") on February 16, 2017.  Tr. 160-206.  A second

hearing was held on August 29, 2017.  Tr. 208.  The ALJ issued an unfavorable decision, finding

that Johnson was capable of performing light work.  Tr. 372-373.  Johnson appealed, and the

Appeals Council accepted review, remanding the case for another hearing and decision.  Tr. 380-381.

The ALJ held a third hearing on April 18, 2019.  Tr. 253-308.  In his July 24, 2019, decision (Tr. 11-28), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Johnson can perform, i.e., she is not disabled.  Tr. 27.  Johnson requested review of the ALJ's decision by the Appeals Council, and, on April 22, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Johnson was born in 1967 and was 47 years old on the date her application was filed.  Tr. 26.  She completed tenth grade.  Tr. 168-169; Doc. 15, pp. 174-175.

### B. Relevant Medical Evidence[1]

On August 4, 2015, Johnson saw Dr. Malkamaki, M.D., for a follow up at the Physical Medicine and Rehabilitation (PM&R) clinic at MetroHealth.  Tr. 1236; Doc. 15-1, p. 565.  Dr. Malkamaki noted that Johnson had been in a motor vehicle accident in April 2015 and that she complained of pain in her low back, neck, knees and feet.  Upon exam, she had maximal tenderness to palpation over her thoracic spine and bilateral lumbosacral junction with moderate paraspinal hypertonicity.  She had a limited range of motion in her lumbar spine (80 degrees of forward flexion and 25 degrees of extension), but her spine was otherwise stable.  Tr. 1237.  She

---

[1] Johnson only challenges the ALJ's decision with respect to her physical impairments.  Accordingly, only the evidence related those issues are summarized and discussed herein.  Additionally, Johnson included evidence that was not submitted to the ALJ; that evidence is not properly before this Court.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)("[T]his court has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.").  A plaintiff may present new and material evidence to the district court when requesting a sentence six remand, *see id*., but Johnson does not request a sentence six remand.

had 5/5 motor strength in her lower extremities, normal muscle tone, and normal sensation.  Her gait was mildly antalgic with a cane and she had crepitus in her knees bilaterally, worse on the left.  Tr. 1237-1238.  She had not been keeping up with her low back and knee exercises and she was reminded that she needed to diligently perform her exercises 5 times a week to experience long-term benefits.  Tr. 1238.  Dr. Malkamaki noted that he had previously given her a lumbar corset to wear for no more than four hours a day.  Tr. 1239.

In January 2016, an x-ray of Johnson's lumbar spine showed osteoarthritis with slight L5-S1 disc space narrowing.  Tr. 1251; Doc. 15-1, p. 580.  X-rays of her right and left knee did not show any acute pathology.  Tr. 1252-1253.

On March 16, 2016, Johnson returned to the PM&R clinic and saw Dr. Cherin, D.O., for fibromyalgia.  Tr. 1257; Doc. 15-1, p. 586.  She was only occasionally taking her medications.  She reported pain and fatigue and that her left leg gave out; she stated that she had recently fallen off the sidewalk.  Tr. 1256-1257.  Upon exam, her lordotic curvature was increased due to obesity and there was no evidence of scoliosis, spasm, or trigger points.  Tr. 1261; Doc. 15-2, p. 3.  She had 100% flexion and 15% extension, negative straight leg raise testing, normal reflexes, and normal sensation and motor strength.  She ambulated with a straight cane.  She had diffuse tenderness to palpation at her paraspinals and very tight musculature upon Faber and FAIR testing.  She ambulated with a straight cane with knee hyperextension noted in her left lower extremity.  Dr. Cherin's impression summary stated that, although Johnson had not noted improvement since her last visit with Dr. Malkamaki, she had not been exercising or taking her medications properly, had stopped seeing her psychiatrist, and had gained weight.  Tr. 1262.  Dr. Cherin commented that her imaging did not show significant pathology.  She remarked that Johnson had asked for Regional Transport Authority ("RTA") paperwork but Dr. Cherin did not

feel that there was justification for RTA paperwork at that time and that she would reconsider if there was future concrete pathology of nerve damage.  Dr. Cherin diagnosed fibromyalgia, spondylosis of the spine, obesity and major depressive disorder.  She instructed Johnson to restart her medications and undergo physical therapy, perform home exercises, and lose weight. She ordered a left leg EMG.

On April 12, 2016, Johnson had a physical therapy evaluation.  Tr. 1273; Doc. 15-2, p. 15.  Upon exam, she had normal reflexes, intact sensation, negative straight leg raise testing, paraspinal tenderness, slow and decreased trunk rotation, and an independent gait without an assistive device.  She was assessed as having limited mobility overall, leading a sedentary lifestyle, and not keeping up with her prior home exercises.  Her prognosis was assessed as good.

On June 3, 2016, at her fifth and last physical therapy appointment, Johnson stated that the therapy had not been helping and she was discharged.  Tr. 1312; Doc. 15-2, p. 54.

That same day, Johnson saw Dr. Malkamaki complaining of shoulder pain.  Tr. 1320; Doc. 15-2, p. 62.  Upon exam, she had maximal tenderness to palpation over her thoracic spine and the bilateral lumbosacral junction with moderate paraspinal hypertonicity, limited lumbosacral range of motion (80% flexion, 25% extension) but otherwise a stable spine, a mildly antalgic gait with a cane, full strength, normal sensation and reflexes, bilateral crepitus of the knees, and left shoulder tenderness with an impaired range of motion.  Tr. 1323.  Dr. Malkamaki diagnosed chronic low back pain, fibromyalgia, left knee pain, plantar fasciitis, and acute onset of left shoulder rotator cuff syndrome since March 2016.  He commented that she had not been keeping up with her low back and knee rehab.  Tr. 1325.

On June 21, 2016, Johnson went to the emergency room with pain and swelling of her left foot for 3-4 days.  Tr. 1347; Doc 15-2, p. 89.  She was admitted.  Tr. 1352.  It was very

4

painful to ambulate and she did not do so.  Tr. 1352-1353.  She was discharged on June 24 with a diagnosis of idiopathic gout of the left foot and was prescribed Colchicine, Ibuprofen and Percocet.  Tr. 1354-1355.  Prior to discharge, Johnson had an occupational therapy evaluation. Tr. 1373.  She reported that she was independent with her activities of daily living, she ambulated with a straight cane most of the time, and at home she had a rollator walker and a shower chair.  Tr. 1373.  She was noted to use a cane/rolling walker for bed and toilet transfers and deemed to have a level of "modified independence," i.e., she used a device and required increased time.  Tr. 1373, 1375.

On July 14, 2016, Johnson returned to the emergency room for left lower leg pain similar to what she experienced at the emergency room visit the prior month.  Tr. 1455; Doc. 15-2, p. 197.  She was out of her medication.  Tr. 1457.  She stated that she normally walks with a cane but requested crutches.  Tr. 1455.  She was diagnosed with acute idiopathic gout and prescribed medications.  Tr. 1457-1458.

On July 18, 2016, Johnson followed up with rheumatology for her gout.  Tr. 1475; Doc. 15-2, p. 217.  Upon exam, she had full range of motion in her shoulders, hips, and knees, and her left ankle was slightly warm and painful with motion but with no limitations.  Tr. 1479.  She had good flexion, extension, and lateral flexion of her neck and back.  Tr. 1479.  Her gout was assessed as stable on her medication, colchicine, and she was instructed on how to dose for any flares.  Tr. 1482.

On September 6, 2016, Johnson saw Dr. Malkamaki at PM&R.  Tr. 1502; Doc. 15-2, p. 244.  He exam findings were as before: maximal tenderness to palpation over her thoracic spine and the bilateral lumbosacral junction with moderate paraspinal hypertonicity, limited lumbosacral range of motion (80% flexion, 25% extension) but otherwise a stable spine, a mildly

antalgic gait with cane, full strength, normal sensation and reflexes, bilateral crepitus of the knees, and left shoulder tenderness with an impaired range of motion. Tr. 1504. She was to continue her home exercise program. Tr. 1506.

Later that day, Johnson saw primary care physician Dr. Lang, M.D., to establish care. Tr. 1511, Doc. 15-2, p. 253. Upon exam, she had normal findings, including a normal gait. Tr. 1512. Dr. Lang recommended she see a rheumatologist to discuss using allopurinol, which she had previously declined to take, for preventive care. Tr. 1513, 1511.

On September 28, 2016, Johnson followed up with rheumatology. Tr. 1518; Doc. 15-2, p. 260. She reported having had a mild gout flare the week before but that she was able to increase her medication for improvement and was able to bear weight. Tr. 1519. She also stated that she used a cane for her back pain and that her knee sometimes gave out. Tr. 1519. Upon exam, she had an exaggerated lumbar lordosis, positive Faber testing, full range of motion in her hips and knees, and her left ankle was slightly warm and tender with no limitations. Tr. 1522. She was diagnosed with presumed gout and chronic back pain possibly related to lordosis and muscle spasm, as she had had a fairly normal lumbar MRI in 2014 and she needs a cane to walk. Tr. 1525. She was educated about a gout-friendly diet and started on allopurinol. Tr. 1525.

On November 11, 2016, Johnson saw Dr. Lang for a follow up. Tr. 1532; Doc. 15-2, p. 274. She reported falling and having flare-ups of gout. Tr. 1532. Upon exam, she had paraspinal tenderness, knee crepitus, no edema, normal muscle tone, and she walked with a limp. Tr. 1534.

On November 15, 2016, Johnson saw Dr. Malkamaki and reported gout flare-ups and that she had fallen two weeks earlier when her knees gave out and she had hurt her right knee. Tr. 1579; Doc. 15-2, p. 321. She reported that she was put on colchicine, which helped. Tr. 1580.

Johnson requested a letter for her disability paperwork and a letter excusing her from her community service obligation, and Dr. Malkamaki stated that it was "not appropriate" for him to provide a letter "just because she feels that she cannot work."  He stated that that day would be the last time he would write her a letter, justifying it due to knee pain and observed knee contusions, but "NO more after this."  Tr. 1580.  He continued, "All of her diagnoses have a good prognosis[.]"  Tr. 1580.  Dr. Malkamaki commented that Johnson had not followed through on her physical therapy and that he could not write that she met the criteria for disability.  Tr. 1583.

On November 30, 2016, Johnson returned to rheumatology.  Tr. 1552; Doc. 15-2, p. 294. She reported a recent mild gout flare in her right knee and foot, she had been off her medication, colchicine, and she resumed that medication two weeks prior after calling the rheumatologist. Tr. 1553.  She reported having trouble getting colchicine due to her insurance.  Tr. 1553.  She currently had no pain or swelling of her joints.  Tr. 1553.  Her exam findings were similar to her prior visit.  Tr. 1555-1556.  Her medications were continued and she was instructed to take ibuprofen if she was unable to get her colchicine.  Tr. 1558.  Her gout was assessed as controlled with medication.  Tr. 1558.

On January 24, 2017, Johnson returned to Dr. Malkamaki for a follow-up.  Tr. 1592; Doc. 15-2, p. 334.  She complained of pain in her knees and her knees giving out due to apparent gout attacks.  Tr. 1592.  She had not been doing her home exercise program for her knees and lower back pain.  Tr. 1592-1593.  Her exam findings were similar to her prior visit, with additional non-physiologic knee ligament pain with stress testing, but her knees were stable.  Tr. 1596.  Dr. Malkamaki recommended that she prioritize her home exercise program, particularly for her knees. Tr. 1598.

On January 31, 2017, Johnson saw Dr. Lang.  Tr. 1606; Doc. 15-2, p. 348.  Upon exam, she had tenderness in her low back, knee and shoulder, 5/5 muscle strength, no leg edema, and she used a cane.  Tr. 1606-1607.  Dr. Lang stressed the importance of physical and mental health therapy to address her psychiatric, motivation, mood and mobility issues.  Tr. 1607.  Dr. Lang provided her with a letter excusing her from community service for three months while she addressed those therapy issues but declined Johnson's request for a home health aide because Dr. Lang did not feel it was medically necessary.  Tr. 1607.

On March 9, 2017, Johnson followed up with rheumatology.  Tr. 1616; Doc. 15-2, p. 358.  She reported right knee swelling a few weeks prior (she had a limited number of colchicine pills due to her insurance) and her knee pain was better with rest.  Tr. 1617.  Her chronic back pain was listed as stable and it was noted that she used a cane.  Tr. 1617.  Upon exam, she had an exaggerated lumbar lordosis, positive Faber testing, full range of motion in her hips, normal ankles and feet, and crepitus in her right knee and diffuse tenderness but no warmth or swelling.  Tr. 1620.  Her medication was continued and she was advised to eat a gout-friendly diet.  Tr. 1624.  X-rays of her knees taken the same day showed very small joint effusions bilaterally and was otherwise unremarkable.  Tr. 1628.

On June 23, 2017, Johnson followed up with rheumatology and reported that her left foot had swollen but had gone back down.  Tr. 1640; Doc. 15-2, p. 382.  She also reported back pain. The doctor noted that an aspiration had not been done to prove Johnson had gout, but that it was being empirically treated with allopurinol.  Tr. 1640.  She had been given an increased allopurinol prescription but had not picked her medication up yet.  Tr. 1640.  Upon exam, she had normal hips and ankles and slight warmth in her left knee and a hint of effusion.  Tr. 1641. A uric acid test taken that day was elevated.  Tr. 1645.

On August 15, 2017, Johnson saw Dr. Lang complaining of neck stiffness after she had rolled out of bed a few weeks prior.  Tr. 1675-1676; Doc. 15-2, p. 417.  Johnson advised that she did not want to go back to the PM&R clinic because the doctor wasn't helping her and they wouldn't let her see another one; Dr. Lang replied that her doctor there had wanted her to go to physical therapy and that she had not been compliant with that.  Tr. 1676.  Upon exam, she had tenderness to palpation in her back, no edema, normal muscle tone, she bent forward when walking, was able to sit and "move up to exam table and back," and her gait was "abnormal – walks with cane for balance.  Tr. 1680-1681.  Dr. Lang advised that Johnson's disability forms would best be completed by the PM&R clinic and that she should follow up with therapy; nevertheless, Dr. Lang did complete her forms.  Tr. 1682.  She opined that Johnson had "some limitations with walking quickly or quick turns and balance" and commented that Johnson should work towards goals that "steer her away from a disability mindset."  Tr. 1682-1683.

On March 29, 2018, Johnson saw Dr. Lang; upon exam, she had no leg edema and an abnormal gait with a cane.  Tr. 1713-1714; Doc. 15-2 p. 455.

On April 13, 2018, Johnson returned to rheumatology.  Tr. 1738; Doc. 15-2, p. 480.  The doctor commented that Johnson was last seen in June 2017 when she was on 300 mg of allopurinol a day; because her uric acid levels were elevated the doctor had sent her a message in MyChart, since she was listed as being "active" in MyChart, to increase her allopurinol to 400 mg and return back in a month, but that Johnson had not done so and had apparently not gotten the message.  Tr. 1738.   Upon exam, she had normal hips and ankles, slightly puffy knees and her left knee was slightly warm, and she had a slightly dusky-looking and swollen second toe on her left foot.  Tr. 1738.  The doctor commented that it was "totally unclear" how much allopurinol Johnson was taking and believed it was 100 mg a day rather than 300 mg.  Tr. 1739.

She had not gotten any follow up testing done as requested, as, apparently, she did not use MyChart.  Tr. 1739.  The doctor prescribed 400 mg of allopurinol a day, submitted approval for colchicine to be taken daily, and ordered labs and a left foot x-ray.  Tr. 1739.  An x-ray of her left foot showed an element of hallux valgus as well as hammertoe deformities involving the 2nd through the 5th toes and some spurring; the impression was degenerative changes.  Tr. 1744.  Her uric acid levels had normalized.  Tr. 1744.

On April 23, 2018, Johnson started physical therapy for fibromyalgia pain, right knee pain, and neck and shoulder pain.  Tr. 1760; Doc. 15-2, p. 502.  Upon exam of her lower extremities, she had decreased right quad strength (4-/5) and decreased flexibility in her right knee.  Tr. 1762.  She ambulated independently with a straight cane.  Tr. 1763.  She was to have 1-2 visits a week for a total of 10 visits.  Tr. 1763.

On May 25, 2018, Johnson returned to physical therapy; she explained that her month-long absence was due to having the flu.  Tr. 1824; Doc. 15-3, p. 28.  She had not been doing her exercises due to having been ill.  Tr. 1823.  She had been observed to have arrived at the gym with a forward head posture and carrying a straight cane.  Tr. 1823.  She was noted to ambulate independently with a straight cane.  Tr. 1823.

On August 30, 2018, Johnson saw Dr. Lang.  Tr. 1909; Doc. 15-3, p. 115.  Upon exam, she had no edema, no difficulty reaching or sitting, she was slow to stand, and she had an abnormal gait.  Tr. 1910.

On December 31, 2018, Johnson went to the emergency room with pain in her left foot that started the day before and felt similar to prior gout flares.  Tr. 1984; Doc. 15-3, p. 189.  She had taken her medication but it had not helped; she stated that she had previously been prescribed Percocet, which had helped prior gout flares.  Tr. 1984.  She denied pain anywhere

else and stated that she had been generally feeling well.  Tr. 1984.  Upon exam of her 1st MTP joint of her left foot, she had mild erythema and edema and tenderness to light palpation there and in her other MTP joints in that foot.  Tr. 1986.  She was treated with Percocet, which improved her pain, and given a Percocet prescription and discharged.  Tr. 1986.

On March 15, 2019, Johnson saw Dr. Lang for a follow-up.  Tr. 2117; Doc. 15-3, p. 322. Upon exam, she had an abnormal and antalgic gait and walked well with a cane.  Tr. 2122.  She had no edema and bilateral paraspinal and musculoskeletal tenderness.  Tr. 2122.  She did not raise her right arm above 90 degrees due to pain.  Tr. 2122.  Dr. Lang referred her to neurosurgery and to the PM&R clinic for her shoulder and neck issues.  Tr. 2124-2125.

On April 9, 2019, Johnson began physical therapy for right knee and shoulder pain.  Tr. 2304; Doc. 15-4, p. 42.  She stated that she used a cane for her knee pain.  Tr. 2306.  Upon exam, she ambulated with a straight cane and had a left-sided antalgic gait.  She stated that she wanted to focus on her neck and shoulder.  Tr. 2308.  Her prognosis was good, she was given home exercises, and the plan included gait training and postural re-education.  Tr. 2309.

On April 15, 2019, Johnson saw a neurosurgeon for her neck and shoulder pain.  Tr. 2317, 2321; Doc. 15-4, p. 55.  She stated that her balance was "ok" and that she does not fall. Tr. 2317.  Upon exam, her gait was antalgic and she was unable to walk in a straight line.  Tr. 2321.  She had negative straight leg raise testing.  Tr. 2321.  She was diagnosed with cervical radiculopathy and a cervical MRI was ordered.  Tr. 2321.  The MRI showed diffuse disc bulge at C5-6 and C6-7 with more than 50% anterior CSF space encroachment and severe right foramen stenosis second to facet arthrosis at C3-4.  Tr. 2342.

On April 17, 2019, Johnson saw Dr. Paul, M.D., at PM&R clinic, to complete a functional exam form provided by Johnson's lawyer for her disability application.  Tr. 2326;

Doc. 15-4, p. 64.  She reported left knee pain and buckling, falling, low back pain, and neck pain and numbness.  Tr. 2327.  Dr. Paul reviewed Johnson's imaging.  Tr. 2327.  Her functional history listed that Johnson was able to ambulate with a walker and perform her activities of daily living at a modified independent level.  Tr. 2330.  Upon exam of her low back and lower extremities, she had a decreased lumbar lordotic curve, no tenderness in her low back area, 5/5 motor strength, intact sensation and reflexes, full range of motion in her hips, and negative provocative testing (straight leg raise, Faber's).  Tr. 2330.  Dr. Paul's impression was fibromyalgia, osteoarthritis of her back and knees, and gout.  Tr. 2333.  Dr. Paul filled out Johnson's paperwork and recommended a pain management consultation.  Tr. 2333.

### C. Opinion Evidence

#### 1. Treating source

On August 26, 2015, Dr. Malkamaki, completed a medical source statement on Johnson's behalf.  Tr. 1226-1227; Doc. 15-1, pp. 555-556.  Dr. Malkamaki opined that Johnson's lumbar spinal stenosis, fibromyalgia, and plantar fasciitis limited her to lifting and carrying 10 pounds occasionally and 5 pounds frequently; standing and walking for 1-2 hours total in an 8-hour workday for 20-30 minutes at a time; and sitting for 6-7 hours per workday for 1 hour at a time.  Additionally, she could rarely perform all postural activities, except balancing, which she could perform occasionally; and she had restrictions with heights, moving machinery, temperature extremes, and pulmonary irritants.  Dr. Malkamaki stated that Johnson had not been prescribed a cane, walker, brace, TENS unit, or a wheelchair.  He indicated that she needed to be able to alternate positions between sitting, standing, and walking at will, and that Johnson experienced moderate pain but that it did not interfere with her concentration, take her off task, or cause absenteeism.  She did not need to elevate her legs at will or require additional, unscheduled

breaks during the workday.  He opined that Johnson was "okay with current restrictions for light to sedentary level job."

On January 23, 2017, Dr. Malkamaki completed another medical source statement on Johnson's behalf.  Tr. 1590-1591; Doc. 15-2, pp. 332-333.  Dr. Malkamaki opined that Johnson's fibromyalgia, chronic low back pain, left knee contusion, and plantar fasciitis limited her to lifting and carrying 1-5 pounds occasionally and 1-3 pounds frequently; standing and walking for 2-3 hours total in an 8-hour workday for 20 minutes at a time; and sitting for 5 to 6 hours per workday for 30 minutes at a time.  Additionally, she could rarely perform all postural activities, except climbing and stooping, which she could perform occasionally; and she had restrictions with heights, moving machinery, and temperature extremes.  Dr. Malkamaki stated that Johnson had been prescribed a cane but had not been prescribed a walker, brace, TENS unit, or a wheelchair.  He indicated that she needed to be able to alternate positions between sitting, standing, and walking at will, and that Johnson experienced moderate pain but that it did not interfere with her concentration, take her off task, or cause absenteeism.  She did not need to elevate her legs at will or require additional, unscheduled breaks during the workday.  He opined that, with those restrictions, Johnson would be able to sustain gainful employment at a very light to sedentary level.

On August 16, 2017, Dr. Lang completed a medical source statement on behalf of Johnson.  Tr. 1972-1973; Doc. 15-3, pp. 177-178.  Dr. Lang opined that Johnson was limited to lifting and carrying 5 pounds occasionally and 2 pounds frequently because she walked with a cane, which she needed to maintain balance.  She was limited to standing and walking 2 hours total in a workday, for 30 minutes at a time, due to slight knee swelling and forward flexion when she walked.  Her ability to sit was not limited.  Johnson could occasionally balance and

could rarely perform other postural movements due to impaired range of motion in her shoulders and back.  She required environmental restrictions for heights, moving machinery, extreme temperatures, and pulmonary irritants because she used cane for balance.  Dr. Lang indicated that a cane and a walker had been prescribed.  She opined that Johnson did not need to alternate positions during the workday and that she experienced moderate pain, which would interfere with her concentration, take her off task, and cause absenteeism.  She needed to elevate her legs 45 degrees at will and did not require additional unscheduled breaks during the workday.  When asked about any other limitations that would interfere with her ability to perform work, Dr. Lang stated that Johnson walked slowly.

On May 24, 2018, Dr. Lang completed an attending physician statement on behalf of Johnson.  Tr. 1798; Doc. 15-3, p. 3.  Dr. Lang indicated that Johnson should be evaluated to determine whether she needed a home health aide due to her gait abnormality, back pain, and mobility issues.  On June 14, 2018, Dr. Lang signed a home health care plan for Johnson.  Tr. 2173; Doc. 15-3, p. 378.  Although the form was purportedly for Johnson, it indicated that, in addition to having back pain and lumbar/sacral somatic dysfunction, Johnson was legally blind, which she is not.[2]  And on certain pages of the home health aide paperwork, Johnson's name is listed at the top but the pages contain information for a different person—a 78-year old individual with a urostomy bag who walked with a cane.  E.g., Tr. 2188, 2201, 2204.  The paperwork indicates that the individual it referenced had a cane and a walker.  Tr. 2173.

On April 17, 2019, Dr. Paul completed a medical source statement on behalf of Johnson Tr. 2150-2151; Doc.15-3, p. 355.  Dr. Paul opined that, due to cervical spine related issues, Johnson was limited to lifting and carrying 5 pounds occasionally and 2 pounds frequently.  She

---

[2]  There is no indication that Johnson has vision problems; at her consultative exam she was noted to have 20/20 vision in both eyes, the left with correction.  Tr. 1250.

was limited to standing and walking 0 hours in a workday due to x-rays from 2017 showing small osteophytes and very small joint effusions in her knees.  She could sit for 1 hour in a workday, for 5 minutes at a time, due to her unremarkable lumbar MRI from 2014.  She could rarely perform all postural movements due to her unremarkable lumbar spine MRI and her cervical spine x-ray showing degenerative changes.  She had no environmental restrictions.  Dr. Paul indicated that all the following devices had been prescribed: cane, walker, TENS machine, and a brace.  She would need to alternate positions during the workday and she experienced severe pain which would interfere with her concentration, take her off task, and cause absenteeism.  She needed to elevate her legs 120 degrees at will and would require additional unscheduled breaks during the workday of 1.5 hours.

### 2. Consultative Examiner

On January 4, 2016, Johnson saw Dr. Sioson, M.D., for a consultative examination.  Tr. 1249-1250; Doc. 15-2, pp. 578-579.  Johnson reported pain in her back, hips, and knees for 10 years, which she related to arthritis and fibromyalgia that was diagnosed 3 years ago.  She described having lower back pain that traveled down her legs.  She reported that she had been using a rolling walker with a seat for 2 years that had been prescribed to her.  She was brought to the appointment by medical transport, although she stated that she could drive but preferred not to.  She lived alone and did light cleaning, laundry, vacuuming, cooking, and dishes, and her sister came over to do heavy lifting, cleaning, and go grocery shopping with her.  She could lift and carry 10 pounds and dress, groom, shower, button, tie, and grasp.  Her pain was 10/10 and physical therapy made it worse.  Medications brought her pain down to a 5/10 level and she used a TENS unit that helped a little.

Upon exam, she walked with a minimal limp using a rolling walker and a moderate limp

without it, and Dr. Sioson noted that she tended to hold on to things without the walker, "so probably obligatory."  She was able to get up and down from the examination table.  She had no extremity edema and a two-inch abrasion on her shin from a fall Johnson stated she had had a few days prior.  She had painful range of motion in her hips and her knees were tender with a grinding sensation on range of motion, worse on the left, but no apparent effusion of instability.  She had no heat, redness, swelling, subluxation, or gross deformity in her joints and no muscle atrophy.  She had a markedly pear-shaped body with increased lordosis and moderate low back tenderness, negative straight leg raise testing upon sitting but positive upon lying down at 10 degrees, her reflexes were difficult to elicit, and she had six tender points.  Manual muscle testing was affected by pain and showed decreased strength (4/5) in her hips and knees and decreased range of motion in her lumbar spine, hips and knees.  Tr. 1254-1256.  Dr. Sioson ordered x-rays of her lumbar spine and her knees, which were unremarkable.  Tr. 1251-1253.  He concluded, "if one considers limitation of range of motion from pain and above findings, work related activities would be limited to sedentary work."  Tr. 1250.

### 3. State Agency Reviewing Physicians

On July 17, 2015, state agency reviewing physician Dr. Manos, M.D., reviewed Johnson's record and, regarding her residual functioning capacity, opined that Johnson was limited to light exertion work and that she could never climb ladders, ropes, or scaffolds, could occasionally kneel, crouch, and crawl, and could frequently climb ramps and stairs, balance, and stoop.  Tr. 336-338.  She must avoid concentrated exposure to extreme cold and heat, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.  Tr. 338.  A cane was not required for all ambulation.  Tr. 337.

On January 8, 2016, state agency physician Dr. Knierim, M.D., adopted Dr. Manos'

findings, but with the following, additional limitations—Johnson was limited to frequent pushing and pulling with her lower extremities and she should avoid all exposure to hazards.  Tr. 351-53.

### D. Testimonial Evidence

#### 1. Johnson's Testimony

Johnson was represented by counsel and testified at the administrative hearing.  When asked why she was unable to work, Johnson stated that she has lower back problems.  Tr. 262.  She was told that she has 60% arthritis in her spine based on x-rays that had been taken years ago.  Tr. 263.  Also, she still has complications from an aneurism she had had in 2011; she gets headaches and neck pain.  Tr. 263-264.  She has gout and often has flare-ups.  Tr. 264.  A lot of times the gout is in her left foot and it travels up close to her knee.  Tr. 264-265.  Her left knee gives out and she has fallen a lot of times as a result.  Tr. 265.

Johnson lives alone in an apartment.  Tr. 265.  She is unable to do household chores; she has a home health aide.  Tr. 265-266.  The aide comes 6 days a week and stays for two hours.  Tr. 266.  The aide cooks, cleans her house, and helps her get in the shower; she was prescribed a shower chair by her primary care physician, Dr. Lang.  Tr. 266.  She doesn't go shopping; if she needs something like groceries, her sister or brother will get them for her.  Tr. 266-267.  Sometimes she goes with them and takes her walker and she has to sit down.  Tr. 267.

Johnson testified that she uses her walker daily in her home.  Tr. 267.  The only time she doesn't use the walker is when she goes to doctor appointments.  Tr. 267.  The medical transport van picks her up.  Tr. 267.  She needs the walker because her knee gives out due to her back problems.  Tr. 268.  When she uses her cane she has to sit down more often than when she uses her walker.  Tr. 268.

Johnson has a gout flare every two months and a flare lasts about a week.  Tr. 268.  It

causes severe swelling.  Tr. 268.  She takes medications for it and they help with the flare-ups unless it is a really bad one.  Tr. 269.  When she has a gout flare she can hardly walk; most of the time it affects her left foot, but she can't use her right foot because her left one hurts so bad.  Tr. 269.  She scoots around on her walker.  Tr. 269.  She does not leave the house.  Tr. 269.  She also has smaller gout flares about every two weeks.  Tr. 269.  When she has a bad flare every two months, she goes to the hospital.  Tr. 270.  There, they elevate her foot to about a 45-degree angle and give her anti-inflammatory medication.  Tr. 270.  Once, they thought she had an infection that was so bad they admitted her.  Tr. 270.  She only elevates her feet when she has a gout flare.  Tr. 270.  As soon as she feels one coming on, she takes her medications.  Tr. 271. She was also given dietary restrictions, which she follows.  Tr. 271.

Johnson has low back pain every day.  Tr. 271.  On an average day, her pain is 8/10.  Tr. 272.  She can't get out of bed half the month because it hurts so bad.  Tr. 272.  She clarified that she does get out of bed; she just does not want to get out of bed.  Tr. 272-273.  On those days it takes a while to get out of bed and she has to move around to try to work it out.  Tr. 272. Nothing she does at home helps with the pain.  Tr. 273.  Ice does not help much; a heating pad is soothing.  Tr. 273.  Her medications help if she takes 2 or 3 of them together.  Tr. 273.  She is on Gabapentin, Cymbalta, Neurontin, Topamax, ibuprofen, and Tylenol.  Tr. 274.  Bending down and standing or sitting too long makes her back pain worse.  Tr. 274.  She estimated that she can sit for about 20 minutes before needing to change positions from a seated position.  Tr. 274-275. She can walk for about a half a block before she has to sit for 10 minutes.  Tr. 275.  At most, she can lift 5 pounds.  Tr. 275.

Regarding her knees, Johnson testified that both her knees are problematic but that her left knee is worse.  Tr. 276.  It has been a problem for about five years and it comes and goes.

18

Tr. 276.  When she stands more than she should she has problems with her knees.  Tr. 277.  Also, when she sits too long in her shower chair and then stands up, her knee tries to give out on her. Tr. 277.  A home health aide helps her get in and out of the shower but doesn't have to wash her. Tr. 277.

Johnson stated that her fibromyalgia also causes pain in her hips, back and legs.  Tr. 283. When she sits down she hears a popping sound in her knee.  Tr. 284.  She sees her primary case physician, Dr. Lang, every 3 months.  Tr. 284.  When asked about her physical therapy non-compliance, Johnson stated that it was making her pain worse.  Tr. 287.  When asked about records showing she didn't show up or answer calls from physical therapy, Johnson stated that she had called them and told them it was making her worse.  Tr. 287.  When asked who prescribed her cane, Johnson stated that is was a doctor she saw whose name she did not recall and who had moved to California.  Tr. 287.  He prescribed a cane and a walker; that was about 3 years ago.  Tr. 287.  She stated that she was having problems walking and then she was falling. Tr. 288.  When asked if she had had physical therapy to teach her how to walk with the cane or walker, Johnson stated that she had therapy to teach her how to walk with her cane but not her walker.  Tr. 288.

### 3.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  The ALJ asked the VE to determine whether a hypothetical individual with Johnson's vocational background could perform work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below.  The VE answered that such an individual could perform the following jobs with significant numbers in the national economy: wire worker, electronics worker, and electrical assembler.  Tr. 298-300.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his July 24, 2019, decision, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since June 22, 2015, the application date. Tr. 20.

2.   The claimant has the following severe impairments: trochanteric bursitis of the bilateral hips, gout, obesity, status post clipped aneurysm, mild degenerative disc disease/osteoarthritis, affective disorders, anxiety disorders and myofascial pain/fibromyalgia. Tr. 20.

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 20.

4.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 16.967(b) except she is limited to frequent pushing/pulling. She can occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds. She can frequently balance and stoop, but only occasionally kneel, crouch or crawl. She must avoid concentrated exposure to extreme heat, extreme cold, humidity, noise, vibration, fumes, odors, dusts gases, poor ventilation etc. She must avoid all exposure to hazards such as unprotected heights and heavy dangerous machinery. She can carry out simple routine tasks and can interact occasionally with others in a work environment where changes are less than frequent. She cannot engage in arbitration, negotiation, conflict resolution, management or supervision of others, or being responsible for the safety of others. Tr. 22.

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5.      The claimant has no past relevant work.  Tr. 26.

6.      The claimant was born in 1967 and was 47 years old, which is defined as
        a younger individual age 45-49, on the date the application was filed.
        The claimant subsequently changed age category to closely approaching
        advanced age.  Tr. 26.

7.      The claimant has a limited education and is able to communicate in
        English.  Tr. 26.

8.      Transferability of job skills is not an issue in this case because the
        claimant's past relevant work is unskilled.  Tr. 26.

9.      Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform.  Tr. 27.

10.     The claimant has not been under a disability, as defined in the Social
        Security Act, since June 22, 2015, the date the application was filed.  Tr.
        27.

## V. Plaintiff's Arguments

Johnson argues that the ALJ erred when he evaluated her use of an assistive device and

the opinion evidence.  Doc. 18.[4]

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

---

[4] In her brief, Johnson states that she is also challenging the ALJ's decision with respect to her fibromyalgia.  Doc. 18, p. 23.  However, Johnson did not provide any argument in support of this claim; accordingly, any such argument has been waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted)(alterations in original).

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### A. The ALJ did not err when evaluating whether an assistive device was medically necessary

Johnson argues that the ALJ failed to properly analyze the medical necessity of her cane

and rollator walker.  Doc. 18, p. 23.  "[T]he Sixth Circuit has held that if a cane is not a

necessary device for the claimant's use, it cannot be considered a restriction or limitation on the

plaintiff's ability to work."  *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6,

2013) (citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002)); *Cruz-Ridol

Carreon v. Comm'r of Soc. Sec.*, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018), *report

and recommendation adopted*, 2018 WL 1083252.  To be considered a restriction or limitation, a

cane "must be so necessary that it would trigger an obligation on the part of the Agency to

conclude that the cane is medically necessary," i.e., the record must reflect "more than just a

subjective desire on the part of the plaintiff as to the use of a cane."  *Murphy*, 2013 WL 829316,

at *10 (internal citations omitted).  "If the ALJ does not find that such device would be medically

necessary, then the ALJ is not required to pose a hypothetical to the VE."  *Id*.  Generally, an

ALJ's finding that a cane or other assistive device is not medically necessary is error when the

claimant has been prescribed an assistive device and the ALJ did not include the use of the

device in the RFC assessment without providing an explanation for the omission.  *Cruz-Ridolfi*,

2018 WL 1136119, at *15 (quoting *Watkins v. Comm'r of Soc. Sec.*, 2017 WL 6419350, at *11

(N.D. Ohio Nov. 22, 2017), *report and recommendation adopted*, 2017 WL 6389607); SSR 96-

9P, 1996 WL 374185 (July 2, 1996) ("To find that a hand-held assistive device is medically

required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)").

### 1. Rollator walker

First, with respect to Johnson's use of a rollator walker, the ALJ did not err.  As Defendant points out, Johnson relies heavily on treatment notes discussing Johnson's need for and observed use of a rollator walker from 2011, at the time she had had aneurysm clipping surgery and during her subsequent recovery, when she struggled with mobility issues.  Doc. 21, p. 15; Doc. 18, pp. 23-24, 26 (Johnson's briefing citing transcript pages from 2011).[5]  Defendant argues that that evidence is not relevant to the ALJ's decision in this case because Johnson had been found "not disabled" by the Agency in April 2013, a decision she did not appeal.  Johnson does not respond to Defendant's argument.

The undersigned finds that Defendant's argument is well-taken.  The Agency's April 2013 decision, which covered 2011, was administratively final.  Accordingly, evidence from 2011 cannot establish error by the ALJ in this case, as the ALJ here was tasked with determining whether Johnson was disabled beginning on June 22, 2015.  Doc. 21, p. 15; Tr. 11-12 (ALJ's decision stating that Johnson had been found not disabled by the Agency in 2013 and that that decision was final and binding); Tr. 312-322 (ALJ's April 2013 decision finding that Johnson was "not disabled" beginning in June 2011).

Johnson submits that consultative examiner Dr. Sioson opined that a rollator walker was "probably obligatory" based on the fact that she used one with a mild limp at the exam, and, when ambulating without it, had a moderate limp and tended to hold on to things.  Doc. 18, p.

---

[5] Johnson cites Tr. 883-885, 888, 899, 928, 969; Doc. 15-1.

24.  But Dr. Sioson's statement that Johnson's walker is "probably obligatory" is not a prescription.  Nor is it an unequivocal statement of an affirmative finding.  *See Nolcox v. Berryhill*, 2019 WL 1331582, at *9 (N.D. Ohio Mar. 25, 2019) (physician's unequivocal statement that the claimant "may" require a limitation is not an affirmative finding).  Moreover, Dr. Sioson's observation that Johnson used a walker does not show that the walker was medically necessary.  *See Robinson v. Comm'r of Soc. Sec*., 2015 WL 1119751, at *15 (N.D. Ohio Mar. 11, 2015) (physician's notations on treatment notes that the claimant walked with a cane was insufficient to show a cane was medically necessary).

Johnson's reliance upon a record from a hospital stay for gout in which she used a rollator walker for ambulation (Doc. 18, p. 24) is not persuasive evidence that the ALJ erred when finding that an assistive device is not medically necessary.  First, the ALJ discussed Johnson's gout and found that it was controlled by medication, a finding that Johnson does not challenge.  Next, as discussed above, there is no prescription for a walker in the record for the time period at issue in this case.  There is no treatment note in which a provider stated that Johnson required a rollator walker.  Therefore, the ALJ did not err when he found that a walker was not medically necessary.  *C.f. Cruz-Ridolfi*, 2018 WL 1136119, at *15 (An ALJ's finding that an assistive device is not medically necessary is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment without providing an explanation for the omission); SSR 96-9p.

### 2. Cane

Johnson complains that the ALJ found that her cane had not been prescribed and contends that Dr. Malkamaki had "reported that the cane was prescribed" in his 2017 opinion.  Doc. 18, p 23.  This argument fails.  First, Dr. Malkamaki had stated in his 2015 opinion that

Johnson had *not* been prescribed a cane.  Tr. 1227.  Johnson does not identify any record

evidence showing that she was prescribed a cane or describing the circumstances for which a

cane is needed, as the ALJ observed.  Tr. 22.  *See also* SSR 96-9p; *Parrish v. Berryhill*, 2017

WL 2728394, at *12 (N.D. Ohio June 8, 2017) ("While there are some indications in the medical

records that Plaintiff was using a cane, this is insufficient to establish that the cane was medically

required.  Nor does Plaintiff cite to any medical records describing the circumstances for which a

cane is needed as required by SSR 96-9p.").[6]  Moreover, the ALJ rejected Dr. Malkamaki's

opinion because (1) Dr. Malkamaki himself had expressed doubt as to his opinions; (2) he

repeatedly remarked that Johnson had been non-compliant with treatment and that she had a

good prognosis if she complied; and (3) he stated that he had had a long conversation with

Johnson about the fact that he did not believe that she had a disability from a musculoskeletal

standpoint even though Johnson herself believed it.  Tr. 25.

Johnson contends that there is evidence in the record showing that she suffered from falls

and that her knee gave out.  Doc. 18, pp. 24-25.  But the ALJ acknowledged that there was

evidence in the record of falls, her knees giving out, and that she used a cane.  See ALJ's

decision, e.g., Tr. 16 (Johnson's testimony that she used a cane and a walker for standing and

walking and that her knee gave out, causing her to fall); Tr. 17 (mildly antalgic gait with a cane

at a 2015 visit with Dr. Malkamaki, crepitus in her knee); Tr. 18 (walked with minimal limp with

rolling walker, moderate limp without it and tended to hold onto things at consultative exam with

Dr. Sioson and, upon exam, had tender knees with grinding on range of motion; ambulated with

a straight cane at the PM&R clinic in March 2016); Tr. 19 (reporting a fall to Dr. Malkamaki in

2016; mildly antalgic gait with a cane at a 2017 visit with Dr. Malkamaki and reporting that both

her knees were giving out due to gout attacks); Tr. 20 (walked with a cane for balance at a 2017

---

[6] Report and recommendation adopted, 2017 WL 2720332.

visit with Dr. Lang, had an abnormal gait with a cane at a 2018 visit with Dr. Lang); Tr. 21

(walked well with a cane at a 2019 visit with Dr. Lang; knee buckling reported to Dr. Paul in

2019).  However, the ALJ explained why he did not find that a cane was medically necessary.

The ALJ explained that Johnson's gout was generally well controlled by medications.

Tr. 19, 22.  He remarked that her imagining was relatively normal.  Tr. 22, 17 (unremarkable

lumbar spine MRI from December 2014); Tr. 18 (x-rays in 2016 showed her lumbar spine

having osteoarthritis with slight disc space narrowing at L5-S1, no acute pathology in her knees;

2017 x-ray of her knees in 2017 showed very small joint effusions).  He remarked that she

sometimes walked without a cane.  Tr. 22.  She denied falls at a neurology visit in 2019.  Tr. 21.

And she was regularly found to have full strength upon exam and normal sensation and reflexes.

Tr. 17, 18, 19, 21.

The ALJ discussed, in detail, the consistently reported observations made by her treating

providers, Drs. Lang and Malkamaki, that Johnson's condition would improve with home

exercises and physical therapy and that Johnson routinely refused to comply with home exercises

and physical therapy programs.  Tr.  17, 18, 19, 20.  Both Drs. Lang and Malkamaki wrote that

Johnson should steer herself away from a disability mindset because she was not disabled.  Tr.

19, 20.  Doctors either denied Johnson's request for certain restrictions or grudgingly provided

them.  Tr. 18 (Dr. Cherin at PM&R uncertain if Johnson needed a requested RTA pass providing

her with an attendant); Tr. 19 (Dr. Malkamaki stating that it was inappropriate for him to keep

writing letters excusing Johnson from community service obligations due to her belief that she

cannot work and that he would only write her one more letter and could not state that she met the

strict disability criteria; thereafter, Johnson began treating with Dr. Lang, who wrote a letter

excusing her from community service while also noting that Johnson asked for a home health

aide but that this was not medically indicated); Tr. 20 (Dr. Malkamaki would not write Johnson an RTA pass because her diagnoses had good prognoses; Dr. Lang agreeing to fill out a disability form but stated that PM&R would be in a better position to complete it).  The ALJ observed that Dr. Lang did eventually sign a form indicating that Johnson needed a home health aide, but the ALJ discredited that evidence because Johnson's minimal findings in x-rays and upon exam did not indicate such a need, and, moreover, the home health aide paperwork referred to another individual who was 78 years old and had a urostomy bag.  Tr. 20.  In short, the ALJ's decision contains sufficient evidence and analysis to support his finding that a cane was not medically necessary.

Johnson's additional arguments are unavailing.  She complains that the ALJ cited a physical therapy note showing that Johnson had an independent gait without an assistive device but did not mention that she showed decreased trunk rotation and strength at that visit.  Doc. 18, p. 25.  However, an ALJ is not required to discuss every piece of evidence in the record.  *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  And the ALJ acknowledged that Johnson had decreased range of motion in her spine.  E.g., Tr. 17. Furthermore, the physical therapist listed Johnson's prognosis as "good" but, as the ALJ observed, Johnson would not comply with physical therapy programs.  Finally, Johnson submits that when she showed a normal, narrow based gait on June 16, 2016, she was being evaluated for shoulder pain, "not a visit to address mobility or knee issues."  Doc. 18, p. 25.  She does not deny that the record showed she had a normal, narrow-based gait and does not cite legal authority indicating that an ALJ is not permitted to rely on evidence of a normal gait during an evaluation for another impairment.

The ALJ did not err when he found that a cane was not medically necessary.

### B. The ALJ did not err when evaluating the opinion evidence

Johnson argues that the ALJ erred when he gave "great weight" to the state agency reviewing physicians' opinion even though they never examined her and their opinions were based on an incomplete record.  Doc. 18, pp. 28-29.  But an ALJ does not err when assigning great weight to a non-examining sources' opinion.  *See Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 633 (6th Cir. 2016) (the ALJ did not err when assigning more weight to non-examining source opinions over a treating source opinion).  Furthermore, it was not error for the ALJ to rely upon the state agency reviewers' opinions based on an incomplete record because the ALJ considered the later evidence.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) (an ALJ does not err when she relies on state agency reviewing opinions based on an incomplete record when the ALJ considers the later evidence); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("[W]e require some indication that the ALJ at least considered [later evidence] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'" (quoting *Fisk v. Astrue*, 253 Fed. App'x. 580, 585 (6th Cir. 2007)).

Next, Johnson argues that the ALJ gave too little weight to the opinions of her treating physicians, Drs. Lang and Malkamaki.  Doc. 18, p. 30.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the

treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Johnson contends that the ALJ erred when he stated that Dr. Lang's opinion was not consistent with the record and exam findings because, Johnson asserts, Dr. Lang's standing and walking limitations are "well-documented in Dr. Lang's notes showing Johnson had an antalgic gait" and in notes from other doctors.  Doc. 18, p. 30.  But, as the ALJ noted, Dr. Lang limited Johnson to standing/walking for .5 hours at a time for a total of 2 hours in an 8-hour day due to "slight knee swelling and forward flexion when walking," not because of an antalgic gait.  Moreover, the ALJ explained,

> The undersigned gives this opinion little weight because it is not consistent with the record and findings on exam. Dr. Lang saw the claimant the date these forms were completed and noted that claimant was not compliant with physical therapy (Exhibit C12F/31). Claimant showed normal range of motion of the neck. She had normal muscle tone. She showed pain with range of motion of the left shoulder. She was able to manipulate her purse and papers with her hands. She walked with a cane for balance. She was able to sit up and move up to the exam table and back. Despite telling claimant that mobility forms would best be completed by PM&R, Dr. Lang completed the forms. Dr. Lang opined claimant has some limitations with regard to walking quickly or quick turns and balance. Mentally and psychologically, claimant did not seem limited other than her perception and problems with pain. Claimant should follow up for therapy. Dr. Lang told claimant she should continue to work towards goals that steer her away from a disability mindset. Dr. Lang also strongly encouraged psychiatry follow up (Exhibit C12F/35-38). As noted above, the record does not contain the criteria outlined in SSR 96-9p, showing that use of a cane or other ambulatory aid is medically required.

Tr. 25.  The ALJ's discussion provided "good reasons" for discounting Dr. Lang's opinion and those reason are supported by the record.  This is not a case in which the ALJ provided a "perfunctory assessment," as Johnson contends (Doc. 18, p. 30).

Johnson also argues that the ALJ erred in giving "little weight" to Dr. Malkamaki's opinions when he found that his opinions were "'not consistent with the medical evidence of record' and then claims that Dr. Malkamaki expresses doubt as to the opinions."  Doc. 18, p. 31.  Johnson states, "This is a disingen[u]ous reading of the evidence."  Doc. 18, p. 31.  The undersigned disagrees.  The ALJ explained why he found Dr. Malkamaki to have expressed doubt about his opinions regarding Johnson's ability to work:

> In treating notes, Dr. Malkamaki counseled the claimant that it was inappropriate to write letters for long-term disability and he would write a three-month letter for her community service obligation due to knee pain at that time. He would not write any more letters (Exhibit 8F/40). On January 24, 2017, he noted the claimant was not doing her knee or low back pain exercises. She has a good prognosis if she is compliant (Exhibit C11F/1-2). He noted that last time he saw the claimant they had a long conversation about the fact that she's not disabled, from an MSK (musculoskeletal) standpoint, in the doctor's opinion, but she believes that she is, and so in brief this is what he calls emotional disability (Exhibit C11F/5).

Tr. 25.  The record supports the ALJ's recitation of the evidence.

Finally, Johnson argues that the ALJ erred when he assigned "little weight" to Dr. Sioson's opinion.  Doc. 18, pp. 31-32.  The ALJ considered Dr. Sioson's opinion as follows:

> Eulogio Sioson, M.D., examined the claimant at the request of the State agency on January 4, 2016. Claimant told Dr. Sioson she lived alone and did the laundry, vacuuming, light cleaning, cooking, dishes- her sister comes and does heavy lifting and cleaning and goes grocery shopping with her. The claimant is able to dress, groom, shower, button, tie and grasp. She could lift and carry 10 pounds. She rated her pains 10/10 — medications bring down the pain to 5/10. Claimant had a brain aneurysm in 2011. The aneurysm was clipped at MetroHealth Medical Center. She walked with minimal limp with rolling walker — moderate limp without it and tended to hold on things so probably obligatory. She was able to get up and down the examination table. Her hips were non-tender but with pain on range of motion. Her knees were tender with grinding sensation on range of motion, worse on the left. There was no apparent effusion or instability. She had no heat, redness, swelling, subluxation and gross deformity in the joints. Claimant was able to manipulate and grasp with each hand. Straight leg raising was negative. There was no muscle atrophy. There was no apparent radiculopathy, no gross deformity or inflammatory changes in the joints. Claimant had 6 tender points. Dr. Sioson opined claimant would be limited to sedentary activity (Exhibit C5F). The undersigned gives this opinion little weight because it is inconsistent with the evidence of record. Claimant herself told Dr. Sioson she was able to do household chores

such as laundry and vacuuming, which are inconsistent with sedentary activity. At a later exam at Metro, claimant's straight leg raising was negative and sensory exam, strength and fine coordination were normal (Exhibit C6F/1-6). Xrays of the bilateral knees and lumbar spine did not show acute pathology (Exhibit C5F/3-5). Notes from Metro indicate that imaging from the past three years did not show significant pathology (Exhibit C6F/1-6). This is also a one-time evaluation with limits based largely on claimant's subjective complaints.

Tr. 17-18.  Johnson submits that her ability to perform light household chores is not inconsistent with sedentary work.  Doc. 18, p. 31-32.  However, the ALJ pointed to additional evidence when discounting Dr. Sioson's opinion, namely her largely normal diagnostic reports and exam findings.  Although Johnson identifies evidence in the record that, she believes, supports her assertion that she is disabled, the questions is whether the ALJ's decision is supported by substantial evidence.  Here, the ALJ's decision is supported by substantial evidence. Accordingly, his decision must be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion, even when substantial evidence may support the claimant's position).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: May 28, 2021

/s/Kathleen B. Burke

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).